Filed 3/4/26  In re J.N. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.N. et al., Persons Coming Under the Juvenile Court Law. | B344944 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.K.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 24CCJP03682A-B |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Commissioner. Affirmed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

J.K. (Mother) appeals jurisdictional and dispositional orders concerning minors J.N. and L.N. under Welfare and Institutions Code section 300, subdivisions (b)(1)[1] and (c). Mother challenges the sufficiency of the evidence supporting jurisdiction, the juvenile court's jurisdiction to adjudicate custody while a family court proceeding was pending, and the removal, custody, and visitation orders. Finding no reversible error, we affirm.

**COMBINED FACTUAL AND PROCEDURAL HISTORY[2]**

## I. Family Court Proceedings

In May 2020, Mother filed for divorce from K.N. (Father). The parties stipulated to an order for a privately compensated temporary judge. Alleging Mother had severe substance abuse issues, Father requested sole physical custody of the children with monitored visitation and drug testing for Mother.

In March 2021, the private judge ordered the parents to have joint legal and physical custody of the children, and also ordered Mother to submit to alcohol breathalyzer testing. The private judge observed the parents "are embroiled in a deep, intense and destructive conflict" but determined that despite Mother's substance abuse challenges, the testing protocols had kept the children safe.

In September 2023, the parents reached a marital settlement agreement with joint legal and physical custody of the children. In May 2024, the family law court entered a judgment of dissolution, with custody and visitation ordered as set forth in the settlement agreement.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] This part includes facts contained in documents attached to Mother's request for judicial notice, which was granted on October 9, 2025.

## II.     The Dependency Petition

On November 21, 2024, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition seeking jurisdiction over then 11-year-old J.N. and nine-year-old L.N.

Count b-1 alleged Mother's history of substance abuse rendered Mother incapable of providing regular care and supervision of the children. Mother was under the influence of alcohol while the children were under her care and supervision on October 17, 2024, and on numerous prior occasions, placing the children at risk of serious physical harm.

Count b-2 alleged Mother's history of mental and emotional problems and suicidal ideation rendered Mother incapable of providing regular care and supervision of the children. Mother failed to take her psychotropic medications as prescribed, placing the children at risk of serious physical harm.

Count b-3 alleged that on prior occasions, Mother drove under the influence of alcohol and prescription medication while the children were passengers. The petition originally alleged Father failed to protect the children, but this language was later stricken by the juvenile court.

Count c-1 alleged Mother emotionally abused J.N. by abusing alcohol, threatening to kill or harm herself if J.N. visits Father and telling J.N. he should have never been born. As a result, J.N. allegedly exhibited anxiety, insomnia, and guilt, was afraid of Mother, and refused to return to Mother's home.

## III.    Events Leading to the Petition

On October 17, 2024, DCFS received a referral after an incident at Mother's home. The children called Father that morning because Mother was too intoxicated to drive the children to school. Mother had drunk alcohol all night and was unable to wake up. Mother was yelling, "rambling incoherently," and "acting really drunk" and scary. The children woke up to find men in their bedroom.

3

When Father arrived, he observed Mother on the ground with three men in the home. One man told Father that Mother was unable to drive and had been drinking all night without sleep. Father reported the children were "visibly shaken," necessitating an emergency session from their therapist. Both children feared Mother's behavior and refused to go to Mother's home unless she stopped drinking.

Police officers dispatched to Mother's home did not notice any slurring of speech, red eyes, or odor of alcohol; Mother appeared not to be under the influence.

Following the October 17, 2024 incident, DCFS investigated. The school social worker reported this was the second time J.N. had been referred to her. In September 2024, J.N. disclosed Mother tried to drive him while under the influence. J.N. reported Mother's alcohol use and possible pill consumption, and said he did not feel safe with Mother.

Between October 17, 2024, and the filing of the petition on November 21, 2024, Mother attempted to pick up the children from school on two occasions despite their protests. On October 29, 2024, both children refused to leave with Mother. J.N. asked to stay in the classroom, and both children were adamant about not going with Mother. J.N.'s teacher stated the children had never seemed fearful of Mother until that day, and J.N. was almost in tears. School staff smelled alcohol on Mother but could not definitively state she was under the influence. Mother had not driven to the school; she had arranged transportation through Uber.

On November 6, 2024, Mother again tried to pick up the children from school with her attorney present. The principal and a school police officer both smelled alcohol on Mother's breath, though they could not definitively say whether she was under the influence. Mother was not driving; she had a driver. Father arrived with his attorney participating by phone. The supervising child social worker (CSW) told the principal that the parents should abide by the family court order, but neither parent

produced the order. When Father's attorney asked what was stopping Father from taking the children home, the officer responded, "Nothing." The children refused to go with Mother, insisting they did not feel safe with her. The principal did not believe Father was coaching the children.

The day after DCFS filed the November 21, 2024 petition, Mother attempted to pick up the children from school with a friend. When the children saw Mother, they ran into a classroom. The children refused to go with Mother, even with the presence of a trusted third party, because they did not feel safe. J.N. cried, breathed hard, and said "[e]verything was happening at once." The principal thought Mother did not look healthy but could not say whether she was under the influence.

## IV. Evidence of Mother's Substance Abuse

### A. Historical substance abuse

Father reported that when he first met Mother, she was a "recovered heroin addict." In 2009, Mother was injured while working and was prescribed opiates for pain, which caused her to relapse. Mother consumed alcohol and pills during both pregnancies. Mother took hydrocodone, Adderall, Klonopin, sleeping pills, and alcohol while pregnant with L.N., who was born with neonatal abstinence syndrome and heart defects requiring surgery.

Mother admitted to using marijuana, cocaine, and heroin in the past, stating she did "everything under the sun" as a teenager, but denied ever having an addiction. Mother maintained she stopped using all drugs when she was 17 years old.

### B. Current substance abuse

The children provided detailed and consistent accounts of Mother's ongoing substance abuse. J.N. reported Mother drank alcohol almost every time he and L.N. were in her care, including in the middle of the night and almost every morning. Both children reported Mother drank tequila. J.N. saw a clear white

5

bottle on the dishwasher and observed Mother pouring tequila into a plastic bottle. L.N. said Mother drank more than one cup of alcohol every day.

With respect to prescription medication, J.N. reported Mother kept 12 or 13 pill bottles with "illegal drugs" in her purse with the labels ripped off. He identified two bottles as seizure medication; the rest he believed were pain pills and sleeping pills. J.N. described Mother's intake of pain medication as "excessive." Although J.N. never saw Mother take pills, he determined she was taking them by checking her purse before and after school to see if pills were missing. L.N. confirmed Mother took pills that made her "act crazy," describing them as being in orange containers.

Both children described the effects of Mother's substance abuse on her behavior. J.N. said Mother acted weird and angry after drinking tequila and taking pain medication, with yelling and sudden mood changes from "jovial and upbeat to erratic and hostile." J.N. also said Mother has invited strangers to her home, given access to the children's bedroom, and attempted to drive them in her vehicle while intoxicated. L.N. described Mother acting drunk and weird when she drinks alcohol, with her voice changing and yelling. The children reported Mother smoked cigarettes in front of them and smelled like alcohol and cigarettes.

The children's therapist, who had seen them for three years, confirmed the children's accounts, stating the situation at Mother's home had worsened. The children felt unsafe because when Mother drank, she was unpredictable and incompetent to care for them, requiring them to fend for themselves. The children recounted times when Mother drank throughout the weekend with no one cooking food, at which point they prepared cereal for themselves. The therapist believed the children were credible and not coached.

Paternal aunt described Mother's excessive drinking during the COVID-19 pandemic when the family lived with them, reporting Mother drank more than a bottle of tequila a day. At J.N.'s recent birthday party, paternal cousin observed Mother looking drugged out and smelling like alcohol and cigarettes. Paternal aunt recalled seeing 10 bottles of unknown contents inside Mother's purse.

Corroborating the children's accounts, J.N.'s teacher reported that on October 16, 2024, the children arrived late to school around noon because they could not wake Mother up. J.N. disclosed there were strangers in the house and a lot of noise throughout the night. The children also reported Mother's substance abuse to Father's partner, paternal aunt, and a family friend.

### C.    Mother's treatment and drug testing

Mother was diagnosed with generalized anxiety and Attention Deficit Hyperactive Disorder and was prescribed Adderall, Klonopin, seizure medication, and a muscle relaxer. Mother's psychiatrist last saw her in person in 2023 and communicated with her only by e-mail for medication refills. The psychiatrist reported no concerns regarding substance abuse, misuse of medication, or mental health. The psychiatrist noted Mother had several profiles on the CURES system, which tracks controlled substance prescriptions. The psychiatrist discovered Mother was taking significant doses of a muscle relaxer of which the psychiatrist was unaware, indicating Mother was obtaining controlled substances from at least one other doctor.

Mother's therapist, who had treated her since the summer of 2022, saw her once per week or every other week, primarily through text. In January 2025, however, they had not had an official session in weeks. The therapist reported no concerns regarding substance abuse or suicidal ideation.

Mother's drug testing results were telling. Mother tested negative for all substances on October 28, 2024, and January 3,

7

2025. However, these negative tests showed she was not taking Adderall as prescribed. On December 20, 2024, Mother tested positive for amphetamines. Mother failed to drug test on eight occasions: November 12, November 14, November 22, December 9, December 27, 2024, and January 7, 15, and 24, 2025.

### D. Mother's driving under the influence

According to the children, Mother had driven them while under the influence of alcohol. J.N. did not always witness Mother drinking alcohol before she drove them. He was able to smell the alcohol, however, and Mother acted similarly to times when J.N. did see her drink alcohol. L.N. explained that on October 16, 2024, he and J.N. refused to let Mother drive them because they smelled alcohol on her. However, they acquiesced after Mother "became emotional" and "proclaimed that she would harm herself." Father confirmed Mother has driven the children while under the influence on multiple occasions.

### E. Mother's denials

In an interview conducted on January 23, 2025, Mother denied the allegations against her. Mother denied any current substance abuse, stating she drinks alcohol maybe once a week, such as a glass of wine or champagne, and last consumed tequila in December 2024. Mother said she takes psychotropic medications as prescribed and denied any medication abuse.

Concerning the October 17, 2024 incident, Mother stated she had been completely sober that day and the day before, having only taken Adderall as prescribed. She denied ever having been under the influence while the children were in her care. Mother attributed the smell of alcohol to her hair products, which contain alcohol as a top ingredient.

## V. Evidence of Mental Health Issues and Threats of Self-harm

Both children reported Mother threatened to harm or kill herself. J.N. said Mother threatened to hurt herself if he and L.N.

8

did not listen or if they said they wanted to be with Father. On October 17, 2024, when J.N. told Mother he was going to call Father, she said, "Okay, call your dad because you won't see me again." When Father arrived, Mother stated, "Everything will die. You're never gonna see me again!"

L.N. confirmed Mother said she did not want to live anymore. He was unsure if she would hurt herself but said, "She might, because she's crazy." Father corroborated recent instances where the children have disclosed Mother attempts to guilt the children by threatening self-harm if she ever has to be without them.

The children's therapist believed Mother might say things to the children that made them worry she might harm herself. The children were struggling with Mother's ideations of self-harm and mentioned Mother's veiled threats of never seeing her again.

In August 2024, Mother stopped in the middle lane while driving the children to school and told them to "get the fuck out of the car" and walk to school. The children showed up at Father's door crying and repeated Mother's words. Mother later explained she became anxious because her vehicle had been recalled and the lights were going on and off.

In September 2024, Mother's boyfriend reported to Father that Mother told J.N. to get in the car while drunk, J.N. ran off, and Mother threatened to call law enforcement. Mother reportedly told J.N., "I hate my life, you shouldn't be alive," and "threaten[ed] to hurt or kill herself."

Father reported Mother's family revealed Mother had suicidal ideation as a minor. Mother denied any history of suicidal ideation or attempts and denied ever hinting she would harm herself.

## VI.  Impact on the Children

The children exhibited significant emotional distress because of Mother's behavior. J.N. described his relationship with Mother as not the best and believed Mother wanted him out of

the picture. He said Mother was obsessed with calling him dangerous and blamed him for almost getting arrested. Mother made J.N. feel like he was the cause of everything bad, including blaming him for leaving the door open when the cat died.

Both children had difficulty focusing in school. J.N. asked Father, "Is it my fault [Mother] drinks? She drinks because of me, right?" J.N. felt he had to manage Mother and tiptoe around her mood changes.

J.N. had insomnia and felt stressed out. He said he would only hurt someone in order to protect himself, specifically identifying Mother as the threat. He elaborated that sometimes when Mother is being scary, he thinks he might need to block her or spar if she comes at him, recalling an incident when Mother grabbed him and chased him around the house.

The children repeatedly expressed fear of Mother and insisted they did not feel safe with her. J.N. stated, "I hope I don't have to go back. I love it here so much," referring to Father's residence. L.N. pleaded, "Please don't make me go back until she gets help" and "don't make me go back anytime soon. I just don't wanna go [to Mother's home]."

The children's therapist reported the children appeared to feel more secure and at ease in Father's care due to the stability of knowing they would return to Father's home every day. L.N., who had previously been protective of Mother, expressed after October 17, 2024, that he did not feel safe and did not want to return to Mother. The therapist stated "different type of alarm bells went off" because L.N. was always Mother's protector.

According to the school counselor, both children appeared anxious and expressed worries about Mother's substance abuse. On October 17, 2024, J.N. met with the counselor and appeared overwhelmed, explaining he was forced to sleep in Mother's bed because strangers slept in his bed. J.N. reportedly had trouble focusing in school due to Mother's crying and threats of self-harm.

The children's pediatrician stated the children did not feel safe returning to Mother's house, reporting Mother was under the influence, and there were strangers in the household. The pediatrician was "sure that there is a clear history of substance abuse by mother in the past," which he discovered during Mother's pregnancy, though he had never personally seen Mother under the influence.

## VII. Renewed Family Court Proceedings

On October 23, 2024, Father filed a request for domestic violence restraining order and child custody modification, seeking sole custody and supervised visits for Mother. The request was based largely on the October 17, 2024 incident giving rise to the DCFS referral and Mother's history of substance abuse. The family court denied any temporary restraining orders but set a hearing for November 18, 2024.

On November 18, 2024, the family court held a hearing on Father's request but continued the hearing to January 13, 2025, based on the agreement of the parties and the ongoing DCFS investigation. The court ordered the parents to comply with the existing custody and visitation orders but noted it did not expect anyone to force the children into a car "kicking and screaming against their will." After the November 18 hearing, Mother attempted to pick the children up on November 22, 2024, apparently believing the court admonished Father for keeping the children from her. (See pt. III, *ante.*)

On January 13, 2025, pursuant to Father's request and because the juvenile court had assumed jurisdiction, the family court dismissed Father's request without prejudice.

## VIII. Detention Proceeding

The section 300 petition was filed on November 21, 2024. That same day, DCFS proposed a safety plan with measures to ensure the children would feel safe. The measures included: the identification of a "safety person" who would determine whether Mother consumed alcohol and assure the children that Mother

11

was not under the influence prior to any visit; Father to provide a cell phone to the children to use in an emergency; conjoint counseling for Mother and the children; Mother to refrain from alcohol, especially in the presence of the children; unannounced visits by DCFS; and drug testing. Mother asked if the proposal was voluntary and did not give a definitive answer on whether she would cooperate with the plan.

On December 2, 2024, DCFS obtained authorization to remove the children from Mother's custody and release them to Father. That same day, DCFS monitored a visit between the children and Mother at a park. The children initially refused but eventually agreed with hesitation after assurances that the CSW would monitor the visit.

On December 4, 2024, DCFS filed a request to detain the children from Mother pursuant to section 385. The following day, the juvenile court ordered the children detained from Mother, finding that remaining in her home would be contrary to the children's welfare.

On December 9, 2024, the juvenile court conducted the detention hearing and kept the children detained from Mother, released the children to Father, and ordered monitored visits for Mother.

## IX.   Adjudication and Dispositional Hearing

The adjudication and dispositional hearing took place on February 4, 2025. Mother sought dismissal of the petition based on insufficient evidence. The juvenile court sustained the petition largely as pled, except it found Father nonoffending and amended the last sentence of count b-3 to strike Father's purported failure to protect the children. In sustaining the petition, the court relied on the children's statements in the DCFS reports, which it found to be "totally believable," as well as the statements of other witnesses. The court declared the children dependents of the court pursuant to section 300, subdivisions (b) and (c), and placed

12

them in Father's home under DCFS supervision with continued monitored visitation for Mother.

DCFS recommended shared 50/50 legal custody with no mention of tie-breaking authority. Father asked for sole legal custody or tie-breaking authority, and Mother objected to sole legal custody. Father joined in DCFS's recommendation of sole physical custody. Mother opposed removal of the children from her home. In the alternative, Mother requested the juvenile court maintain jurisdiction to allow an opportunity for reunification. Mother agreed to participate in programs and comply with court orders. If the court closed the case, Mother asked for the case to be sent to mediation so that visitation details could be worked out.

The juvenile court determined by clear and convincing evidence pursuant to section 361, subdivisions (c) and (d) that "there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being . . . of the child[ren], and there are no reasonable means by which the child[ren]'s physical health can be protected, without removing the child[ren] from the home and the care, custody, and control of that or those parent(s)/legal guardian(s)." The court told Mother, "I'm just advising you today that, when the case closes, I'm going to be making orders about what you need to do before you can even go to family court," including a six-month drug and alcohol program with weekly random drug and alcohol testing, a 12-step program with a sponsor, a 26-week parenting class, individual counseling, and conjoint therapy with the children when the children's therapist deems it appropriate.

The juvenile court indicated it would order sole physical custody to Father and joint legal custody with Father to have tie-breaking authority. Mother did not object to joint legal with tie-breaking authority to Father. The court terminated jurisdiction and stayed the order pending mediation and the filing of a custody order.

## X.    Exit Orders and Appeal

On March 11, 2025, the juvenile court lifted the stay and terminated jurisdiction over both children. A JV-200 custody order and final judgment was filed. Father was awarded sole physical custody of the children. Both parents were awarded joint legal custody with Father having tie-breaking authority. Through an attached JV-205 form, the court ordered supervised visitation for Mother pursuant to the terms of an attached mediation agreement and until further order of the court.

In an attached JV-206 form, the juvenile court justified supervised visitation by explaining Mother "has not completed . . . the following court-ordered programs," including a (1) "6-month drug/alcohol program, with weekly testing, after care, 12-step program," (2) "26 week parenting program," (3) "[i]ndividual counseling to address case issues," and (4) "[c]onjoint counseling with minors, when minors' therapist deems it appropriate." This form also stated "[c]ompletion of one of the programs above *might*, but need not, constitute a significant change of circumstances for purposes of modifying this final custody order," pursuant to section 302, subdivision (d). The record contains no objection from Mother to the terms set forth in this form.

Mother filed timely notices of appeal of the juvenile court's orders from February 4, 2025, and March 11, 2025.

## DISCUSSION

We first examine whether substantial evidence supported the juvenile court's jurisdictional findings. We then address whether the juvenile court had jurisdiction to make custody orders and terminate jurisdiction. We next discuss whether the removal, custody, and visitation orders were supported by substantial evidence or were an abuse of discretion.

14

**I.    Substantial Evidence Supports Jurisdiction Under Section 300, Subdivision (b)(1)**

**A.    Applicable law and standard of review**

As pertinent here, under subdivision (b)(1) of section 300, the juvenile court may assert jurisdiction over any child who has suffered, or who is at substantial risk of suffering, serious physical harm or illness because of "[t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" or "[t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1)(A), (D).) "A jurisdiction finding under section 300, subdivision (b)(1), requires [DCFS] to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.)

Here, the petition alleged three counts under section 300, subdivision (b)(1): count b-1 (substance abuse); count b-2 (mental health and suicidal ideation); and count b-3 (driving under the influence).

In a dependency proceeding under section 300, "[t]he standard of proof at the jurisdictional stage . . . is a preponderance of the evidence, and we will affirm the court's findings if they are supported by substantial evidence." (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.) We review the record in the light most favorable to the court's determinations, drawing all reasonable inferences to support the juvenile court's findings and orders. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) We do not exercise independent judgment. Rather, we ascertain whether sufficient facts support the court's findings, even where contradictory facts are present. (*Ibid.*) "We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328.)

15

The parent challenging the juvenile court's findings and orders bears the burden on appeal. (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

While substantial evidence is a deferential standard, it is not toothless. (*In re I.C.* (2018) 4 Cal.5th 869, 892.) Isolated evidence cited out of context of the record does not suffice. Rather, we must consider the evidence supporting dependency jurisdiction in light of the whole record to determine whether the evidence is reasonable, credible, and of solid value. (*Ibid.*)

**B.    Credibility determinations of juvenile courts are entitled to deference**

As a preliminary matter, the juvenile court made its jurisdictional findings and dispositional orders based on the DCFS reports. It found the statements of the children and other witnesses to DCFS social workers to be credible. Relying on *In re Rosenkrantz* (2002) 29 Cal.4th 616 and *People v. Booth* (2016) 3 Cal.App.5th 1284, Mother contends that because the findings were based solely on documentary evidence, we need not defer to the credibility determinations of the juvenile court.

Mother's reliance on these cases is misplaced. *In re Rosenkrantz* held that resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the factfinder and the " 'some evidence' " standard is "extremely deferential." (*In re Rosenkrantz*, *supra*, 29 Cal.4th at pp. 665, 679.) *People v. Booth* involved a criminal habeas proceeding where no live testimony was taken by any tribunal, permitting independent review because the appellate court was in the same position as the trial court. (*People v. Booth*, *supra*, 3 Cal.App.5th at pp. 1305-1306.) Neither case supports abandoning the deferential standard of review in dependency proceedings.

The California Supreme Court has repeatedly held that appellate courts do not reexamine witness credibility determinations made by juvenile courts. (*In re Caden C.* (2021)

16

11 Cal.5th 614, 640; *In re R.T.* (2017) 3 Cal.5th 622, 633; *I.J.*, *supra*, 56 Cal.4th at p. 773.) Dependency cases are often resolved based on witness statements in documentary reports. (See §§ 280, 281, 355, subd. (b); Cal. Rules of Court, rule 5.684(c)(1).) Under Mother's view, we would be called to reexamine credibility in most dependency appeals. We therefore apply the settled deferential standard of review governing dependency appeals.[3]

## C.     Jurisdiction is warranted based on Mother's substance abuse

DCFS alleged in count b-1 that Mother "has a history of substance abuse, including, cocaine, heroin, psychotropic medication, marijuana and alcohol, and is a current daily abuser of alcohol and prescription medication, which renders the mother incapable of providing regular care and supervision of the children. On 10/17/2024, and on numerous prior occasions, the mother was under the influence of alcohol while the children were in the mother's care and supervision."

The record is replete with evidence of Mother's substance abuse. Mother has a history of substance abuse, including using "everything under the sun" in her teenage years, suffering a relapse in 2009 after taking opiates for pain, and consuming alcohol and pills while she was pregnant with both children. This is not merely a historical problem. Substantial evidence demonstrated substance abuse is ongoing. J.N. said Mother drinks alcohol "almost every time" he and his brother are under her care, in the middle of the night and almost every morning, sometimes leaving the children to feed themselves. Both children reported smelling alcohol on Mother, including on the morning of October 17, 2024, when she was supposed to take the children to school.

With respect to medication, both children provided numerous details about Mother taking pills. The juvenile court

---

[3]     Even if we were to abandon the deferential standard of review in this case, we would not reach a contrary result.

could reasonably infer from the children's observations that Mother overmedicates herself.

The record contains substantial evidence of the detrimental effects of Mother's substance abuse. J.N. described Mother's behavior as weird, with yelling and instability in her mood. Mother made the children late to school, invited strangers to her home while intoxicated, and gave them access to the children's bedroom.

The accounts of the children remained consistent during the investigation. Further, the children have reported Mother's substance abuse to third parties, including Father's partner, paternal aunt, a family friend, and school staff. Third parties, including the children's therapist and the school principal, believed them and did not feel they were coached. In addition, the principal, front desk staff, and police officer at the children's school smelled alcohol on Mother's breath. Substantial evidence supports the allegation that Mother has a substance abuse problem.

The record also contains substantial evidence of a substantial risk of physical harm to the children due to Mother's substance abuse. Mother has either driven or attempted to drive the children while under the influence, including on October 17, 2024. Mother denied abusing alcohol or medication or attempting to drive the children while under the influence. Mother failed to show for drug testing for eight of the 11 requested tests. Mother's persistent refusal to acknowledge and confront the problem shows that the problem is likely to continue, requiring the children's removal from the risk. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105 [denial of drug problem supported removal order].)

Both children insisted on multiple occasions that they do not feel safe with mother. According to the children's therapist, L.N. was previously reluctant to speak up against mother but started expressing his fear of her after the incident on

October 17, 2024. Both J.N. and L.N. have become more forceful in their refusal to see Mother. They ran away from Mother on three occasions when she tried to pick them up from school. Based on the children's fear of Mother and efforts to avoid seeing her, the juvenile court could reasonably infer Mother's behavior posed a substantial risk to their physical safety.

Mother argues that viewing the record as a whole, the children's statements are not credible. Mother contends J.N. could not have known the medication Mother was taking was "illegal" because he stated the labels were ripped off. She also contends J.N. could not attribute Mother acting "weird and angry" to her consumption of pain medication because he never saw her take pills. She maintains J.N.'s "eyeball inventory" of her pill intake by looking in her purse before and after school was not credible. Mother also attempts to discredit the children's and Father's observations of Mother's substance abuse while under the influence by pointing out the lack of concern from law enforcement, Mother's psychiatrist, and the pediatrician.

However, "[q]uestions as to the credibility of witnesses and the weight to be given their testimony are for the trier of the facts." (*Hansen v. Bear Film Co.* (1946) 28 Cal.2d 154, 184.) A trier of fact may give credence to a witness "whose testimony contains contradictions or inconsistencies." (*Ibid.*) In such a case, an appellate court is concerned "with the single inquiry whether the record contains substantial evidence tending to support the findings assailed." (*Ibid.*) Moreover, J.N.'s statements about Mother were not the only evidence of her consumption of medication. Father and paternal aunt also provided testimony regarding her excessive medications. Mother has also missed eight out of 11 drug tests. And her psychiatrist was unaware she was taking a muscle relaxant not prescribed by her. Based on this evidence, the juvenile court could reasonably conclude Mother has a substance abuse problem. (*In re K.B.* (2021)

59 Cal.App.5th 593, 601, disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18.)

Given substantial evidence supported jurisdiction based on count b-1, we need not and do not determine whether substantial evidence supported jurisdiction based on the other counts. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127 [dependency jurisdiction "may rest on a single ground"].)

### D. Current risk of harm existed

Mother argues at the time of the hearing in February 2025, the children were not at risk because she did not have unsupervised contact with them since October 17, 2024, when Father took custody of the children. Mother maintains that because the children had been living safely with Father for four months before the adjudication hearing, had refused all contact with her, and Father had a custody modification request pending in family court, there was no current risk of harm requiring dependency jurisdiction.

"Jurisdiction findings under section 300 require evidence the child is subject to a defined risk of harm at the time of the hearing." (*In re B.H.* (2024) 103 Cal.App.5th 469, 480.) Mother's argument overlooks a critical fact: at the time of the hearing, Mother retained joint physical custody of the children under the May 2024 family court judgment. That judgment incorporated the parties' September 2023 marital settlement agreement, which provided for joint legal and physical custody. Under that judgment, Mother had the legal right to exercise parenting time with the children.

Moreover, despite the children's adamant refusals to see Mother, she repeatedly attempted to exercise her court-ordered custody rights by appearing at the children's school on October 29, November 6, and November 22, 2024. On November 6, both the principal and a school police officer smelled alcohol on Mother's breath. On November 22, J.N. cried, breathed hard, and became stressed when Mother appeared, and both

20

children ran into a classroom to avoid her. Mother believed the family court had ordered the children to go with her and told them they had to comply with the court order. The children's attempts to flee and hide when Mother appeared at their school demonstrated they remained at substantial risk during any period when Mother might exercise her parenting time.

Critically, Father had no legal authority under the existing family court order to prevent Mother from exercising her parenting time. While Father filed a request for a restraining order and custody modification in family court on October 23, 2024, the family court denied any temporary restraining orders and set a hearing for November 18, 2024. At that November 18 hearing, the family court continued the matter to January 13, 2025, based on the parties' agreement and the ongoing DCFS investigation. On January 13, after the juvenile court had assumed jurisdiction, the family court dismissed Father's request without prejudice due to the dependency proceedings.

Thus, from October 17, 2024, through the February 4, 2025 adjudication hearing, no family court order prohibited Mother from exercising the parenting time to which she was entitled under the May 2024 judgment. Indeed, at the November 18, 2024 family court hearing, the court ordered the parents to comply with the existing custody and visitation orders, though it noted it did not expect anyone to force the children into a car "kicking and screaming against their will." This left the children in an untenable position: Mother retained the legal right to custody under the family court order, but the children feared for their safety in her care.

We reject Mother's argument that the children could protect themselves by refusing contact, particularly in light of Mother's repeated efforts to pick them up against their will and to guilt them into staying with her by threatening to kill herself. Children cannot be expected to bear the burden of enforcing their own safety. They should not have been placed in the position of

having to run from their Mother, hide in classrooms, and suffer the anxiety and stress of wondering whether Mother would appear at their school each day. The fact that the children took these desperate measures to avoid Mother demonstrates the severity of the risk they faced, not its absence.

Moreover, Mother's persistent denial of any substance abuse problem, her continued attempts to exercise custody despite the children's fear, and her failure to appear for drug testing on eight of 11 occasions since the DCFS investigation commenced all demonstrated that the risk was ongoing as of the adjudication hearing. About 10 days before the hearing, Mother failed to appear for a drug test scheduled for January 24, 2025. In her interview with the dependency investigator filed one week before the hearing, Mother denied ever having been under the influence while the children were in her care and denied ever driving the children while intoxicated. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

The juvenile court's jurisdiction was therefore necessary to protect the children from immediate harm during periods when Mother retained legal custody rights. While Father's family court request might eventually have resulted in modified custody orders, the children needed protection in the interim. The juvenile court's assumption of jurisdiction provided that protection by immediately modifying the custody arrangement and ordering monitored visitation for Mother.

Thus, circumstances existing at the time of the adjudication hearing warranted the juvenile court's exercise of jurisdiction over the children. These include Mother's continued denial of her substance abuse issues, her ongoing attempts to exercise custody rights despite the children's fear, her failure to submit to drug testing, and the absence of any family court order restricting her access to the children. The evidence established

22

not only past harm, but a current, substantial risk of harm at the time of the hearing.

## II. Dependency Proceedings Had Primacy Over Family Court Proceedings

### A. Applicable law and standard of review

Once a juvenile court assumes dependency jurisdiction over a child, any issues regarding custodial rights between the parents are to be determined solely by the juvenile court while the child is a dependent of the juvenile court. (§ 302, subd. (c).) Once a dependency petition is filed, the juvenile court has exclusive jurisdiction to determine custody issues, even if the parents are disputing custody in the family court. (§ 304; *In re Alexander P.* (2016) 4 Cal.App.5th 475, 488.)

Mother contends the juvenile court had no authority to assume jurisdiction over the children and modify the existing custody order because (1) Father purportedly used the juvenile court to circumvent the family court's prior custody determination, (2) the juvenile court found the children were not at risk, and (3) a request concerning custody was pending in the family court. Even if the juvenile court had jurisdiction, Mother argues in the alternative that the termination of jurisdiction with a modified custody order was against public policy.

"The question whether a court is authorized to perform a certain act is a purely legal question" and therefore subject to de novo review. (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1058.) A juvenile court's termination of jurisdiction is reviewed for abuse of discretion. (*In re Leon E.* (2022) 74 Cal.App.5th 222, 233.)

### B. The juvenile court's jurisdiction was paramount

Mother first argues the family court is the proper forum to resolve custody disputes. (See *In re Alexandria M.* (2007) 156 Cal.App.4th 1088, 1096 (*Alexandria M.*).) Instead of allowing his custody request to be adjudicated by the family court in

connection with his request for a restraining order, Father purportedly used the juvenile court for a tactical advantage. Mother points to Father's request for sole physical custody to the family court in 2020 based on Mother's substance abuse. Instead, the family court ordered joint physical custody, finding alcohol breathalyzer testing was sufficient to protect the children. Mother argues Father, dissatisfied with the resolution in family court, initiated the dependency proceeding by requesting an emergency session with the children's therapist, who was a mandated reporter.

Mother relies heavily on *In re John W.* (1996) 41 Cal.App.4th 961, 977 (*John W.*), where the parents were going through a " 'tense' " divorce. Due to the hostile divorce, the parents stipulated to dependency jurisdiction based on a risk of emotional damage under section 300, subdivision (c). (*John W.,* at p. 966.) There was never any finding of abuse. (*Id.* at p. 964.) The appellate court determined the family court should have always heard the case because the resources of social service agencies are "stretched thin" and should be directed at "neglected and genuinely abused children." (*Id.* at p. 975.) "The juvenile courts must not become a battleground by which family law war is waged by other means." (*Ibid.*) A " 'tense' " atmosphere resulting from a divorce is "hardly enough" to warrant dependency jurisdiction under section 300, subdivision (c). (*John W.,* at p. 977.)

"[T]he juvenile court must never, for illegitimate tactical reasons" such as shopping for judges, "become a new front in a family law war." (*In re D.B.* (2020) 48 Cal.App.5th 613, 622 (*D.B.*).) However, where the child is truly neglected or abused, dependency jurisdiction is paramount, even if a custody battle is pending in family court. (*In re Nicholas E.* (2015) 236 Cal.App.4th 458, 466 (*Nicholas E.*).)

Family law and juvenile proceedings serve different purposes. While both proceedings consider the best interest of the

child, the "family law court adjudicates the rights of private parties vis-[á]-vis each other," whereas the "juvenile court takes into account the interest of the state as the guardian of persons with legal disabilities." (*In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1469.) As *parens patriae*, the state is responsible for evaluating the best interests of the child, even if that means the child is not placed in the custody of either parent. (*In re Roger S.* (1992) 4 Cal.App.4th 25, 31.) By allowing juvenile courts to issue custody orders under section 362.4, the Legislature determined the juvenile court is the appropriate place for custody of dependent children to be resolved with such resolution honored in later family proceedings. (*In re Roger S.,* at p. 31; see also § 302, subd. (d) [§ 362.4 custody order cannot be changed by family court absent a significant change of circumstances].) Where the social services agency can show a basis for dependency jurisdiction, concerns over juvenile courts adjudicating family law disputes and limited resources "must give way to the primacy of dependency court jurisdiction and its special role" as *parens patriae* on behalf of the state. (*Nicholas E.*, *supra*, 236 Cal.App.4th at p. 466.)

Here, notwithstanding a pending request for domestic violence restraining order, and accompanying changes to the custody arrangements filed in family court, DCFS proved with substantial evidence J.N. and L.N. are at substantial risk of serious physical harm. While Father's relationship with Mother may be described as tense, this does not necessarily mean that dependency jurisdiction was unwarranted. Even assuming *arguendo* Father somehow maneuvered his custody battle with Mother to the juvenile court for "illegitimate tactical reasons" (*D.B.*, *supra*, 48 Cal.App.5th at p. 622), when a child qualifies as a dependent under section 300, the juvenile court must assume jurisdiction for the protection of the children, against both parents if necessary.

25

This case is not like *John W.* The juvenile court there had no ground for involvement because there was no finding of abuse from the parents. (*John W.*, *supra*, 41 Cal.App.4th at pp. 964-965; see also *Alexandria M.*, *supra*, 156 Cal.App.4th at p. 1097 [dependency jurisdiction should have been terminated because no showing of risk to children].)

Dependency jurisdiction was proper.

## C. The juvenile court's custody orders were based on a finding of risk of harm

Mother next argues the juvenile court lacked jurisdiction to issue custody orders because it struck the allegation Father failed to protect the children from count b-3, thereby impliedly finding the children were not at risk.

Mother relies on *In re Phoenix B.* (1990) 218 Cal.App.3d 787 (*Phoenix B.*) in asserting juvenile courts cannot make custody orders concerning children who are not at risk of harm. In that case, the social services agency initially sought dependency jurisdiction over the child after the mother was involuntarily hospitalized. (*Id.* at pp. 789-790.) The agency later released the child to the father after it determined he was able to care for the child. (*Id.* at p. 790.) At the agency's request, the juvenile court dismissed the dependency petition. (*Id.* at pp. 790-791.) The mother appealed from the dismissal, which was affirmed. (*Id.* at p. 791.) Having determined the father could care for the child, the agency was required under section 309 to release the child to the father. (*Phoenix B.*, at p. 792.)

*Phoenix B.* is inapposite because there, the juvenile court did not assume jurisdiction over the child. (*Phoenix B., supra,* 218 Cal.App.3d at p. 792.) In contrast, as discussed at length above, the juvenile court here assumed jurisdiction, which was supported by substantial evidence of a substantial risk of serious physical harm if the children were released to Mother. Even though J.N. and L.N. were in Father's custody at the time of the hearing, Mother attempted to pick up the children on three

occasions without the children's or Father's consent. Mother was acting on the family court's statement that the May 2024 judgment granting joint legal custody were still in effect. Because Mother posed a risk to the children and a dependency petition had been filed, the juvenile court had exclusive jurisdiction over custody issues, even though it obtained jurisdiction after the family court. (§ 304; *A.H. v. Superior Court* (2013) 219 Cal.App.4th 1379, 1388 (*A.H.*); *In re William T.* (1985) 172 Cal.App.3d 790, 797.)

### D. Terminating jurisdiction with modified custody orders was statutorily authorized

Mother argues the juvenile court had no statutory authority to terminate jurisdiction and place the children with a custodial parent. Citing section 361.2, subdivision (b)(1) in its minute orders, the juvenile court placed the children with Father—a custodial parent—and terminated jurisdiction. Section 361.2 allows a child to be removed from a custodial parent and placed with a noncustodial parent, after which the court may terminate jurisdiction. (§ 361.2, subds. (a), (b)(1).) Mother contends section 361.2 only allows for placement with a noncustodial parent, not a custodial parent such as Father.

However, the juvenile court has "broad authority to enter orders to protect a dependent child and to reunite the family and terminate jurisdiction as quickly as possible." (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 207 (*Destiny D.*).) For example, section 362, subdivision (a) permits the court to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of" dependent children. In addition, section 245.5 allows the court to direct orders to parents it "deems necessary and proper for the best interests of or for the rehabilitation of the minor," including orders concerning custody.

The broad authority granted to the juvenile court "necessarily includes, in an appropriate circumstance, discretion to terminate dependency jurisdiction when the child is in

27

parental custody and no protective issue remains." (*Destiny D.*, *supra*, 15 Cal.App.5th at p. 207.) "It simply makes no sense to conclude . . . that the Legislature intended [in section 361.2, subdivision (b)(1)] to authorize the juvenile court to terminate its jurisdiction at disposition after placement of a child with a noncustodial parent when there is no longer a reason for court supervision and not afford the juvenile court the same discretion when the child has been released to a custodial parent and orders made at disposition have fully resolved any issue of continuing risk of harm." (*Id.* at p. 209.)

Here, the dispositional orders resolved any continuing risk of harm by removing the children from Mother's custody and ordering monitored visitation for her. Since Father obtained full physical custody, the children feel more secure and comfortable. These orders were authorized by the broad authority granted to the juvenile court under sections 245.5 and 362, subdivision (a). To the extent that section 361.2 only allows placement with a noncustodial parent, as opposed to a custodial parent, the citations to the incorrect statute in the minute orders were harmless error. (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 339, 354 [despite citation to inapplicable statute, removal from custody justified by different statute].) Absent a continuing risk of harm, termination of jurisdiction was required. (*Destiny D.*, *supra*, 15 Cal.App.5th at p. 208.)

Mother argues *Destiny D.* was wrongly decided because allowing the placement of children with custodial parents purportedly goes against the public policy of ensuring juvenile courts do not become forums for custody disputes. (*John W.*, *supra*, 41 Cal.App.4th at p. 975.) In addition, Mother believes she was unfairly prejudiced by having "not only an embittered ex-spouse, but a government adversary," i.e., DCFS, "paid at public expense." (*Ibid.*)

We disagree. Section 304 "gives juvenile courts exclusive jurisdiction over minors who are their dependents, and expressly

28

precludes family courts . . . from issuing orders regarding the custody . . . of such minors. The obvious intent of this provision is to eliminate the possibility that different courts claiming jurisdiction over the minor could issue inconsistent orders regarding the minor's custody." (*A.H.*, *supra*, 219 Cal.App.4th at p. 1390.) The purpose of dependency law is to "ensure the safety, protection, and physical and emotional well-being of children" at risk of harm. (§ 300.2, subd. (a).) By enacting section 302, subdivision (c), and section 304, the Legislature prioritized the protection of children over custody disputes by allowing only juvenile courts to determine custody issues.

The termination of jurisdiction was authorized by statute and is consistent with the public policy of promoting the protection of children.

## III. Dispositional Orders Satisfy Substantial Evidence and Abuse of Discretion Review

### A. Applicable law and standard of review

Mother attacks the order removing the children from Mother's custody, the order requiring monitored visitation for Mother, and the order awarding Father tie-breaking authority.

Section 361 governs removal of a child from a custodial parent. "Before the court may order a child physically removed from his or her parents, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 145-146 (*Hailey T.*); see also § 361, subds. (c)(1), (d).) By requiring clear and convincing evidence, rather than preponderance of the evidence, the Legislature recognized the parents' constitutional rights to care for their children and sought to keep children in their homes if they would be safe. (*Hailey T.,* at p. 146.) "Removal 'is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent.' " (*Ibid.*)

29

Section 362.4, subdivision (a) allows juvenile courts to enter orders concerning custody and visitation. Such orders become part of the family court file upon termination of jurisdiction. (*Id.*, subd. (b).) The orders may not be modified by the family court unless the family court finds "a significant change of circumstances since the juvenile court issued the order" has occurred and "modification of the order is in the best interests of the child." (§ 302, subd. (d).) The custody order must be in the child's best interests based on the totality of the circumstances. (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).)

In arguing insufficient evidence in a dependency case, the appellant bears the burden of "showing there is no evidence of a sufficiently substantial nature to support the court's findings or orders." (*Hailey T., supra,* 212 Cal.App.4th at p. 147, citing *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) We review the removal order for substantial evidence, keeping in mind the heightened burden of proof. (*Hailey T.*, at p. 146.) We review the custody and visitation orders for abuse of discretion. (*J.M.*, *supra,* 89 Cal.App.5th at p. 113.)

## B.    Removal order

Citing section 361, subdivision (e) and California Rules of Court, rule 5.690(a)(1)(B)(i), Mother argues the removal order was unsupported by substantial evidence.

Section 361, subdivision (e) requires the juvenile court to state the facts supporting the removal order. During the jurisdictional stage, the court stated it considered the DCFS reports admitted into evidence and listened to the arguments of counsel. During the dispositional stage, the court found removal of the children from Mother was appropriate, holding that clear and convincing evidence demonstrated the children were at substantial risk of harm and no reasonable means except for removal could ensure their safety. The court did not rely merely on formulaic findings. During the adjudication hearing, the court addressed the facts of this case by indicating Mother would have

30

to complete several programs "before [she] can even go to family court," including a drug and alcohol program with weekly testing. By indicating Mother had to complete a drug and alcohol program with weekly testing before she could seek a modification to the custody order, the juvenile court clearly indicated, albeit implicitly, Mother's substance abuse justified the children's removal.

California Rules of Court, rule 5.690(a)(1)(B)(i) requires DCFS to include in its report a "discussion of the reasonable efforts made to prevent or eliminate removal . . . and a recommended plan for reuniting the child with the family, including a plan for visitation." (*Ibid.*) The DCFS reports comply with rule 5.690(a)(1)(B)(i). Upon filing of the petition, DCFS proposed a detailed safety plan, which included a "safety person" who could determine whether Mother was under the influence, Mother refraining from alcohol in the presence of the children, and unannounced visits by DCFS. Mother did not agree to the plan, instead complaining that Father did not have any similar measures restraining him.

While Mother indicated during the adjudication hearing that she was agreeable to the proposed safety plan, this acceptance was hollow. On January 29, 2025, less than a week before the adjudication hearing, Mother denied having a substance abuse problem, engaging in suicidal ideation, or ever driving the children while under the influence. Moreover, Mother had missed six of eight requested drug tests after the filing of the petition, including the most recent test on January 24, 2025, approximately 10 days before the adjudication hearing. Given Mother's denials and avoidance of drug testing, the record contains substantial evidence, even under a clear and convincing evidence standard, that no reasonable means short of removal would protect the children.

Having asserted no other basis for reversal of the removal order, Mother fails to meet her burden on appeal.

## C. Custody and visitation orders

Mother argues the March 11, 2025 final custody order and attached visitation order are flawed in two respects. First, Mother contends the visitation order falsely implies she failed to complete court-ordered programs. Second, Mother maintains the award of tie-breaking authority to Father with respect to legal custody has no reasonable basis.

Concerning the visitation order, the completed JV-206 form states Mother was ordered to have supervised visitation because she "has not completed . . . the following court-ordered programs," including a (1) "6-month drug/alcohol program, with weekly testing, after care, 12-step program," (2) "26 week parenting program," (3) "[i]ndividual counseling to address case issues," and (4) "[c]onjoint counseling with minors, when minors' therapist deems it appropriate." Mother maintains the order implies she has disobeyed court orders. We do not agree. When the court ordered supervised visitation on March 11, 2025, Mother had not completed the listed programs the court was then ordering. While an appellate court may order modification of a written order to conform to an oral ruling, it should do so based on the circumstances of the case. (*In re Maribel T.* (2002) 96 Cal.App.4th 82, 86.) Because the JV-206 form does not imply that Mother disobeyed court orders, we decline to order modification of the visitation order.

Concerning the custody order, the juvenile court awarded joint legal custody to Mother and Father, with Father having tie-breaking authority. Mother contends that no reasonable basis supported this order. Mother points out DCFS recommended shared legal custody with no mention of tie-breaking authority. However, the court was not constrained by the recommendations of DCFS. It had broad authority to fashion orders for the protection of the children. (*Destiny D., supra,* 15 Cal.App.5th at p. 207; see also §§ 245.5, 362, subd. (a).) Here, because Mother posed a substantial risk of physical harm to the children, denied

the allegations of substance abuse, and avoided drug testing, it was eminently reasonable for the juvenile court to award tie-breaking authority to the custodial parent in the event of any disagreements between the parents concerning the care of the children.

Moreover, Mother forfeited her challenges to the custody and visitation orders by failing to object to the specific terms of the restraining order in the juvenile court. In the juvenile court, as to jurisdiction, Mother requested dismissal of the petition based on insufficiency of the evidence. As to disposition, Mother argued against removal of the children from her home, or alternatively, for keeping the case open to allow for reunification with the children or for mediation to allow the parents to work out details for visitation. When the court indicated it would award tie-breaking authority to Father, Mother did not argue against it. Mother also never objected to the phrasing of the visitation order in the completed JV-206 form.

"A reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293. superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) While we have discretion to excuse forfeiture in cases presenting important legal issues (*ibid.*), Mother presents no argument against forfeiture in her reply brief. We decline to excuse Mother's forfeiture. On both the merits and on grounds of forfeiture, Mother's attacks on the custody and visitation orders fail.[4]

---

[4]    Having found no basis for reversal, we do not address Mother's request on remand for assignment to a different bench officer.

**DISPOSITION**

The orders of February 4, 2025, and March 11, 2025, are affirmed.


RICHARDSON, J.

WE CONCUR:


LUI, P. J.


GILBERT, J.*

---

*     Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.